WELLER *v.* MACOMB COUNTY SAVINGS BANK.

1. HUSBAND AND WIFE — CANCELLATION OF INSTRUMENTS — MORT-
GAGES—DURESS—BURDEN OF PROOF.

In a suit by a wife for the cancellation of a note and
mortgage given by her on her individual property as se-
curity for her husband's indebtedness to defendant bank,
the burden of proof resting on plaintiff to establish her
claim that she signed said instruments under duress, *held,*
not sustained by the proofs.[1]

2. SAME—INDUCING CAUSE—PROMISE TO REDUCE INDEBTEDNESS BY
AMOUNT RECEIVED FROM ACCOUNTS RECEIVABLE RECOGNIZED.

Where it appears that the wife was induced to sign said
instruments by a promise that they were only temporary,
and that $10,000 was to be paid on accounts receivable the
coming month, and that it would be applied thereon, the
decree of the court below dismissing plaintiff's bill is
modified, on appeal, and an accounting decreed, the amount
of the accounts received during the 30 days following ex-
ecution of the instruments, not to exceed $10,000, to be
deducted, and the mortgage to stand as security for the
balance.[2]

Appeal from Macomb; Reid (Neil E.), J.    Sub-
mitted June 5, 1925.    (Docket No. 50.)    Decided
October 27, 1925.

Bill by Mabelle M. Weller against the Macomb
County Savings Bank and another for the cancellation
of a mortgage.    From a decree dismissing the bill,
plaintiff appeals.    Modified and affirmed.

*Warren S. Stone,* for plaintiff.

*Lungerhausen, Weeks & Lungerhausen (Bert V.
Nunneley,* of counsel), for defendants.

[1]Cancellation of Instruments, 9 C. J. §§ 189, 195; [2]Id., 9 C. J.
§ 210.

BIRD, J.    Plaintiff filed her bill in the Macomb circuit court to cancel a mortgage of $15,000 she had theretofore given to the defendant bank.    She was denied relief in the trial court.

It appears from the record that plaintiff's husband, Harold N. Weller, was engaged in the canning and pickling business in Richmond, where defendant bank is located, and that he did business with the defendant bank under the name of H. N. Weller & Company. When the financial depression of 1920 came on he found himself badly involved.    He owed the bank upwards of $30,000 of unsecured indebtedness.    Defendant Hirt, who was cashier of the bank, and made the excessive loans to Weller, commenced to urge Weller to secure the same.    The plant was already incumbered to the bank to secure loans.    Weller finally suggested as a way out of his difficulties that his wife had a valuable equity in a manufacturing plant at Toledo, and possibly she would give a mortgage on that property to secure the bank.    He explained to Hirt that he could not induce her to give a mortgage, but that he, Hirt, could come down to his home and see if he could induce her.    Accordingly the note and mortgage were prepared and Mr. Hirt went to the Weller home in the early evening.    After visiting Weller for a time Mrs. Weller was called from a sick child she was nursing into the living room. Mr. Hirt explained to her how badly her husband was involved with his loans at the bank, and that he was desirous of having her give a mortgage on the Toledo property to secure the loans.    Just what took place previous to the signing of the mortgage is in dispute. She claims he said to her that he had made loans to her husband in excess of what the law allowed; that his board of directors was criticizing him for so doing, and that the banking department at Lansing was also criticizing him.    That he was expecting the bank examiners

any day, and that he did not know what they would do to him and Mr. Weller when they came; that it was a crime for him to make the excessive loans to Mr. Weller, and a crime for Mr. Weller to accept them, and that unless the matter could be arranged both he and Weller would be disgraced and ruined. That he had passed many sleepless nights thinking what might happen when the bank examiners arrived. Plaintiff told him she would not sign a mortgage on her property because she had solemnly promised her father she would sign no papers without first consulting him. They talked further, Mr. Hirt impressing upon her how serious it was for both him and Mr. Weller. Some time after the refusal to sign the mortgage the suggestion was made that she sign a paper to tide the bank over the month, that during the coming month about $10,000 in accounts receivable was coming in and would be applied on the indebtedness, and that the other $5,000 could be taken care of in some other way, and that it would be only a temporary affair. After some further talk she yielded and signed the papers, but she says the room was dimly lighted, she did not have her glasses on and she did not read the paper, and did not know it was a mortgage she signed. Had she known it was a mortgage she would not have signed it. She further claims that Mr. Hirt said if the $10,000 did not come in as expected he would telephone her.

Mr. Hirt denies that he represented to her that it was a criminal matter. He admits, however, that he represented to her that the situation was serious for Mr. Weller and himself. He admits she was promised that any money coming in the coming month should be applied on the mortgage, but that the promise was made by Mr. Weller and not by him. He also denied that he promised to telephone plaintiff if the money did not come in as expected.

The parties whose testimony must decide this matter are vitally interested in the outcome.  Mr. Hirt, the cashier, had advanced $10,000 of his own money to protect some of Weller's loans.  He had been severely criticized by his own board for the excessive loans. Mr. Ullrich and Mr. Lungerhausen, both directors, had protested vigorously.  The banking commissioner had criticized his conduct and had written a letter to the board, criticizing the excessive loans, and had cited Mr. Hirt to appear before him at Lansing in regard to the matter.  Hirt was badly worried.  He had been deprived of his sleep in consequence of it.  In this state of mind he made the evening visit at Weller's house.  The testimony shows he was very anxious and desperate and, therefore, his testimony as to what was said is not as reliable as it otherwise would be.

Weller, plaintiff's husband, was a witness, and corroborated the testimony of his wife.  He is in the attitude of sitting by and allowing a fraud to be perpetrated on his wife, and saying nothing, if she tells the truth.  He sat by and saw her deceived and said nothing.  This testimony, to say the least, is not entitled to great credit.

Mrs. Weller made a good witness.  She is above the average woman in intelligence.  She has a good education.  She comes from a well-to-do family of business people.  She has her own bank account and transacts her own business affairs.  She appeared to be familiar with deeds, mortgages, leases and abstracts.  She is 37 years of age with three children. Her testimony shows she is shrewd and quick-witted. She readily saw the point the lawyers were attempting to make.  She says Mr. Hirt promised her not to record the paper.  If he did, this would indicate she knew it was a paper subject of record.  She says when they called for a witness to the mortgage

"it just dawns on me after I signed the paper, Mr.

Weller says we will have a witness, and both Mr. and Mrs. Jenkinson came into the room, and Mr. Hirt said one will do, and Mr. Jenkinson went back and Mrs. Jenkinson had been his bookkeeper, and he said 'sign this, Daisy,' and she said 'where,' and she signed and walked out, and it flashed on me when she signed that it was a 'frame-up,' and I said 'Mr. Hirt, you will certainly telephone me if it don't come in,' and he said 'I surely will.'"

Without going more into detail, we are impressed that if plaintiff were deceived and alarmed over the situation of her husband to the extent that she was under duress when she signed the mortgage and note, she has failed to establish it. The burden of proof was on her to establish the fact of duress, and we think her proofs failed to meet that burden.

We are, however, of the opinion that she was induced to sign the mortgage and note by the statement that it was only a temporary matter, and that $10,000 was to be paid on the accounts receivable the coming month, and that it would be applied on the note, and that the $5,000 could be taken care of in some other way. As to this statement there is very little conflict, although Mr. Hirt says that he did not make the statement but Mr. Weller did make it. She says they both made it, and also Hirt denied that he promised to telephone her if the payments were not made as expected, but this phase of the matter is not very important. The uncontradicted testimony all shows that this promise was made to the plaintiff. At first she refused absolutely to sign the mortgage and note and gave her reasons for her refusal. Further talk took place, the seriousness of the situation was impressed upon her. She evidently felt that her husband was badly involved, she knew he was worried, and when this promise was made to her she yielded, and she did not yield until it was made. She was interested in *this* promise because she soon after inter-

viewed the bookkeeper to learn whether the statement was true that there would be $10,000 due and payable to the company the coming month. It is our opinion that this promise was the deciding factor with her.

Our conclusion is that plaintiff knew that she was signing a mortgage and note; that when it was first suggested to her she refused and gave the reason for her refusal, and that she did not recede from this position until she was promised the accounts receivable by the company for the coming month should be applied on the note and mortgage. They led her to believe that it was a temporary affair, and, like all good wives, she was willing to lend a hand in the stress of weather. This promise having been made to her, it should be made good. It matters not whether Hirt or Weller made the promise, one of them made it, and the other sat by and by his silence impliedly gave his assent to it.

An accounting should be taken by the trial court, if counsel cannot agree, as to the amount of the accounts which was received for the 30 days after the mortgage and note were signed, and that amount, not to exceed $10,000, should be indorsed on the note and mortgage. The mortgage will stand as security for the balance when this is deducted. When this modification is made the decree will be affirmed. Plaintiff will recover her costs.

McDonald, C. J., and Clark, Sharpe, Moore, Steere, Fellows, and Wiest, JJ., concurred.